## No. 8994.

### LEWIS ET AL. *v.* COOPER INVESTMENT COMPANY.

1. ESTOPPEL—*By Contract.*   The Cooper Company leased to the Shubert Company premises upon which the latter proposed to erect a theater.   The lease provided that the lessor, to secure the payments stipulated to be made by the lessee, should have a lien paramount to all others upon the interest of the lessee.   The Shubert Company issued a series of bonds secured upon the property by assignment of the lease to a trustee, and agreed with the bond holders that the leasehold and building should not be incumbered except upon the written consent of the owners of two-thirds of the bonds outstanding.   After bonds to a very large amount had been sold, the lessor, lessee, and trustee, entered into a supplemental agreement to the effect that "the bonds issued by the lessee upon any building upon said premises shall be first lien upon said lease and buildings."   Later, the building being still incomplete, the Shubert Company without funds, and largely indebted, and it being impossible to find a further market for the bonds, the trustee, and more than the required proportion of the bond holders consented to the execution by the Shubert Company of a mortgage to secure $120,000, to relieve it of its indebtedness.   The mortgage being executed, and this sum being advanced by plaintiff the Shubert Company resumed building, but later defaulted in the ground rent, and in interest upon the loan, whereupon the Cooper Company brought its bill to foreclose the mortgage.   Certain bond holders then filed a petition in intervention claiming a lien by virtue of their bonds, prior and superior to the mortgage, contending in argument that the Shubert Company at the date of the execution of the mortgage had no right, title or interest in the premises, nor any valid power to execute a mortgage thereon, and that the mortgage was void.   *Held* that the mortgage having been executed with the consent of every one having an interest in the premises, was as effectual and binding upon every bond holder as if he or she had personally subscribed the consent to its execution.

*Error to Denver District Court, Hon. John A. Perry, Judge.*

Mr. JOHN H. GABRIEL, Mr. EDWIN H. PARK, Mr. THOS. H. GIBSON, for plaintiffs in error.

Messrs. GILLETT & CLARK, for defendant in error.

Mr. Justice Scott delivered the opinion of the court.

THIS is an action to foreclose a mortgage. The defendant in error, on the 2nd day of June, 1910, executed and delivered to The Shubert Building Corporation a lease for a period of ninety-nine years upon certain lots at the corner of California Street and Eighteenth Street, in the City of Denver. It was stipulated in this lease, in addition to the payment of ground rent, that the lessee should pay the taxes of every kind upon said premises; that to better secure the payment of these obligations the lessor should have a first lien paramount to all others, upon all right, title and interest of lessee in and to said premises as security for the agreed payments; that within four months from the date of the lease, the lessee should commence the erection of a theater and office building, to cover the entire area of the property, of the kind and character provided in the lease, and at a cost of not less than $500,000, and should not charge the property with liens.

Afterward and on the 10th day of June, 1910, the lessor, lessee and The German American Trust Company entered into a trust agreement, the purpose of which is stated in the preamble as follows:

"Whereas, the lessee has obtained from the lessor a lease for a period of ninety-nine years covering lots eleven, twelve, thirteen, fourteen, fifteen and sixteen, block one hundred fifty-nine, East Denver, in the City and County of Denver, State of Colorado, said lease being recorded in the office of the Clerk and Recorder of said city and county in book 2137, at page 1, and

Whereas, the lessee is about to erect on said lots a ten-story office, and a three-story theater building, and intends to raise a fund to cover the cost of such improvements by the issue of not to exceed seven hundred thousand dollars

worth of its six per cent ownership gold bonds (profit-sharing), hereinafter called 'bonds,' a copy of the form of which is hereto attached and marked 'Exhibit A,' and hereby made a part hereof, and the said lessee intends to complete at the present time only six stories of the said office building and to issue to said trustee for such purpose about the sum of four hundred thousand dollars worth of said bonds, and when the said lessee shall complete'the said building by constructing the remaining four stories thereof and issue to the trustee for such purpose such part of the remaining three hundred thousand dollars worth of bonds as may be necessary to complete the said ten-story building, and to certify to the trustee as each part of the said building is constructed the actual cost thereof, and the said trustee is to certify and deliver only such an amount of said bonds as shall be necessary to cover the cost as certified to the said trustee, of the said theater and six-story portion of the said building and of the said additional four-story portion of said building, and the trustee shall receive and disburse the proceeds of said bonds, and hold by assignment said lease in trust and to carry in its name insurance upon said premises in trust, all as specified in said lease, in said bonds and hereinafter, and

Whereas, the lessee purposes selling its bonds either for cash upon written subscriptions, a copy of the form of which is hereto attached, marked 'Exhibit B', and hereby made a part hereof, or on installments under written contracts, a copy of the form of which is hereto attached, marked 'Exhibit C,' and hereby made a part hereof."

Insofar as important here, the lessee specifically agreed:

"That said lease, together with all the right, title and interest of the lessee therein, stands hereby assigned to the trustee upon trust, and for the uses and purposes hereinafter specified.    *    *    *

That upon the delivery of said subscription or said contracts for bonds to the trustee, as hereinabove provided, said subscriptions and contracts shall stand assigned to the

trustee with full authority to said trustee to collect all sums due thereunder. But the duty and expense of enforcing the payment of delinquent subscriptions shall rest upon and be borne by the lessee, if not by the subscriber.

That in case the lessee shall fail to comply with the terms of said lease within thirty days after receipt from the lessor of notice of default, the lessee shall forthwith and without further notice surrender to the trustee the management of said building and the collection and disbursement of all rents and profits until such time as the lessor advises the trustee that the lessee is under the lease no longer in default."

The trustee in this agreement bound itself, among other things, as follows:

"First:   That the trustee hereby accepts the assignment of said lease in trust for the benefit of the bondholders, the bond subscribers, the lessee and the lessor, as their respective interests appear from said lease and this instrument, and from said exhibits hereto attached.

Second:   That whenever the lessee shall exhibit to and leave with the trustee the written consent of the holders of two-thirds in amount of the outstanding bonds to a mortgage or a sale of the rights or any part of the rights secured by said lease, and shall also nominate in writing the mortgagee or the vendee, the trustee shall upon payment to it by such mortgagee or vendee of the consideration agreed upon, assign to such mortgagee or vendee all rights directed to be covered by said mortgage or sale, the acts of the lessee in exhibiting by written consent and in nominating in writing said mortgagee or vendee, shall be conclusive of the trustee's right to make the assignment as aforesaid, and shall be full authority and protection to the trustee in making any such assignment.

In the event of a mortgage, the proceeds shall be disbursed by the trustee in the manner provided for the disbursement of the investment fund. In the event of a sale of the rights or any part of the rights secured by said

lease, the trustee shall distribute the proceeds coming into its hands from such sale as follows, to-wit:

(a)   Such portion of said proceeds as will not exceed in amount the investment fund defined in said bonds to the bondholders pro rata.

(b)   The balance of such proceeds, if any, in excess of said investment fund less the trustee's reasonable fee, to the lessee for distribution according to the terms of said bonds.

(c)   That the trustee hereby accepts the assignments provided for in said lease and agrees to perform the duties imposed upon the trustee by the terms, both of said lease and in this instrument, and of each of said exhibits attached hereto, subject to the conditions herein contained.

(d)   That the trustee shall, upon the full or final payment for any of said bonds in accordance with the subscription or contract therefor, date such bond as a full or final payment, sign the certificate thereon and deliver said bond to the subscriber, taking his receipt therefor.

(e)   That the trustee shall hold in trust all sums paid to it hereunder by subscribers for said bonds or received as proceeds of any mortgage of the lessee's property, and shall make payments therefrom only for: (1) the compensation of the trustee, as herein provided; (2) commissions for obtaining bond subscriptions at the rate of twelve and one-half per cent on the amount of bonds subscribed for, for the construction of said building, the same to be paid as cash payments are made on such subscriptions; (3) ground rent and other payments required under said lease; (4) the cost of the construction of the building, and the purchase of equipment therefor, which lessee has under said lease agreed to construct and furnish, including the building permit and the street and alley protection fees, and any other payments required to comply with the ordinances of the City and County of Denver, and (5) interest on bonds and on payments made on contracts for bonds during the construction of said building.   All the above

payments by the trustee shall be made only upon orders of the lessee approved by the lessor, or its duly authorized agent, and in case of labor and material upon the certificate of the architect, which shall be attached thereto, and the trustee shall keep on file the original written authorizations or orders for all payments made, which shall be full protection and authority to the trustee in the premises. If any premiums shall be paid to the trustee on bonds sold or subscribed for, such premium shall be forthwith paid over to the lessee for credit to the surplus fund. Any interest upon any unused portion of the investment fund shall be paid over to the lessee to be credited to the profit."

Further:

"Seventh: That the trustee shall hold and disburse, according to the terms of said lease, any moneys received under fire insurance policies on said building, * * *.

Eighth: That the trustee shall certify and deliver only such an amount of bonds as shall cover the cost of the theater and six-story portion of said building, and the additional four-story portion of said building and for betterments, and the certificate of the lessee as to such cost shall be final and conclusive as to all parties to this agreement.

Ninth: That the trustee shall make reports to the lessor and to the lessee on or before the 10th day of each calendar month showing all receipts, disbursements and bonds, together with the dates thereof delivered hereunder during the previous calendar month until completion of said building. Subsequently thereto, reports shall be made by the trustee when called for either by the lessor or the lessee, and all monies and securities held by the trustee for the lessee or the bondholders, shall be subject to the inspection and examination of the lessee, or of any agent of the lessee appointed in writing by the Board of Directors of said lessee for that purpose. * * *

Eleventh: That in case the lessee shall fail to comply with the term of said lease within thirty days after receipt

from the lessor or notice of default, the trustee shall assume the management of said building and the collection of all rents and profits and shall make disbursement therefrom as provided by said lease and the exhibits hereto attached and shall perform such service until the lessee shall, under the lease, no longer be in default, or the lease be forfeited under the terms and provisions thereof. For these services, the trustee shall receive reasonable compensation. When the lessee shall be no longer in default the trustee shall forthwith surrender to the lessee the entire management of said building and shall pay over to said lessee all moneys arising from such rents and profits then being in the hands of said trustee, less said reasonable compensation. If said default continue until said lease is forfeited under the terms and provisions of said lease, the trustee shall forthwith surrender to the lessor its possession of said building, if possession it has."

It was further provided:

"That this agreement is not intended to abrogate, modify, or in any manner change any of the provisions of the said lease, except as said lease is modified or changed by the lessor's consent to the following stipulations of this agreement:

(a)    The lessor consents to the assignment of said lease to the trustee as herein made, in trust, however, for the purpose hereinbefore set forth and that said trustee shall not thereby assume any individual liability as assignee of such lease, but shall be liable to the lessor only for any indebtedness or liability of the lessee to the lessor under the terms and provisions of said lease, and to the extent only of any funds it may receive from the said building while said trustee may be in possession of the same under the terms and provisions of this trust agreement. * * *

(e)    The lessor consents to the distribution of insurance moneys as provided in said lease.

That if it shall be found that there is any conflict between any provisions or stipulations of said lease and any

provisions or stipulations hereof, except those last above specified, then the provisions and stipulations of said lease shall prevail and remain in full force and effect, notwithstanding anything herein contained. If any dispute shall arise between said lessor and said lessee as to the existence of any conflict between the provisions of said lease and the provisions of this' instrument affecting any duty upon the part of the trustee, then said lessor and said lessee shall at once give notice to said trustee of such dispute and of the purport thereof."

Attached to this agreement and made a part thereof was a copy of the proposed form of bonds in which the bond was designated as "Ownership Gold Bond, Profit Sharing," in which it was provided that it was one of an issue limited to $700,000 and enough only to be issued to cover the cost of the construction of the building; that a sum of money equal to the face value of all outstanding bonds shall constitute the Investment Fund, and to be expended in the building and equipment of the structure, the payment of commissions for placing the bonds, and trustees' fees; that the investment fund was to be disbursed by the trustee upon orders from the lessee; that the lease was to be assigned to the trustee, with the following provisions as to mortgage of the lease hold property:

"The company hereby agrees with the bondholders that the leasehold and building assigned to the Trustee as security for the Bonds or any property acquired in lieu thereof, shall not be mortgaged or sold except after notice mailed to all bondholders, and then only with the written consent of all the owners of two-thirds in amount of all outstanding bonds and the Company. In the event of mortgage, the proceeds shall be disbursed in the manner provided for the disbursement of the investment fund. In the event of sale, the proceeds therefrom shall be divided as follows: The trustee shall pay to the outstanding Bondholders the face value of the Bonds so held; the remainder, together with the surplus and sinking funds, shall be di-

vided equally between the bondholders and the company, thus terminating the enterprise.

In determining profits, there shall be deducted from the gross income only disbursements incident to the acquisition, ownership, management and protection of the property in which the Investment and Surplus Funds are invested, together with the Sinking Fund, and the Trustee's fees after the completion of said building. The company will bear its officers' salaries and office expenses."

Then follow provisions for the distribution of profits, excess profits, dividends, and surplus funds, as between the Shubert Company and bondholders together with a provision as to the kind of securities in which investment should be made of the surplus funds, but in no place is the obligation under this bond treated as a debt, with promise to pay any definite sum, except upon conditions, with specified rate of interest, or at any fixed time.

At a later date and after there had been sold bonds of the face value of $413,600, and of the net value of $375,-000, and apparently to induce a further sale of bonds, the same parties entered into a supplemental trust agreement, the effect of which was to eliminate that provision in the original trust agreement declaring, "That the lessor shall have and is hereby given a first lien, paramount to all others, upon all the right, title and interest of the lessee in or to the above described premises," and to substitute therefor a provision, "that the bonds issued and to be issued by the lessee upon any building upon said premises shall be and remain a first and prior lien upon said lease and buildings to secure the payment of the same, with interest thereon.

Under these conditions the Shubert company proceeded with the erection of the building, and prosecuted the same until some time in the year 1912, when finding itself without funds, all building operations ceased. No more bonds could be sold, and the building was uncompleted. Added to this the Shubert company was indebted to various parties, including the Central Savings bank in the total sum of

$125,000 which had been expended in the construction of the building, and an additional sum for unpaid taxes. In this situation the Shubert company proceeded to negotiate a loan to pay these debts and to complete the building, in order to provide against forfeiture of the lease, and to protect the investment of the bondholders, who seem to be the only persons who had put any money into the enterprise.

The company applied to the Central Saving Bank & Trust Company for a loan of $160,000 for this purpose, to be secured by a mortgage upon the leasehold premises. This the said bank declined to do but proposed that it would loan the said sum to the Cooper Investment Company, and that such company might reloan the amount to the Shubert company. This was finally agreed to by all the parties. The Shubert company then proceeded to address a circular letter to each of its bondholders stating in detail the conditions with which it was confronted, and with a request for their written consent for the issuance of the mortgage.

This consent was secured from more than the required two-thirds in interest, of the bondholders, and notes and mortgage executed by the Shubert Company to the Cooper Investment Company, to secure the payment of the said sum of $160,000. The Cooper company in turn borrowed this sum from the Central Savings Bank and Trust Company, and the money was deposited with the German American Trust Company, and paid out under the terms of the trust agreement.

It may be noted that the Central Savings Bank & Trust Company before making the loan, required the payment to it of the sum of $14,500 due it from the Shubert company, out of this sum, which was done by check of the Shubert company on the German American Trust Company in conformity with the terms of the trust agreement.

The Shubert company then resumed its building operations and completed at least the theater part of the building, but found itself in further financial difficulties. It owed for labor and materials to the extent of $34,616.97,

and was in arrears for ground rent to the extent of three. monthly payments, and had defaulted in its payment interest on the $160,000 loan. The Cooper company then instituted this foreclosure proceeding. The plaintiffs in error filed their petition in intervention claiming a lien by virtue of their bond holdings, prior and superior to the Cooper company mortgage.

The court rendered judgment in favor of the Cooper Investment Company in the sum of $205,075.35, the amount due on the notes secured by the mortgage, which was ordered to be foreclosed and the proceeds applied, first to the satisfaction of existing liens for labor and materials, and afterward to the payment of the amount found to be due on the mortgage.

While some other questions were raised and determined by the trial court and we think correctly so, there is but one question really urged and stated by counsel for plaintiffs in error as follows:

"Therefore, upon ultimate analysis the fundamental and final question to be determined is that of the validity of the mortgage. This, of course, is dependent upon the right of The Shubert Building Corporation to execute such a mortgage, and of necessity that right is dependent upon (1) a valid existing title in The Shubert Building Corporation at the time of the execution of the mortgage; or (2) if no such title existed, upon some valid power legally conferred upon The Shubert Building Corporation by those in whom the right to confer such power existed, and its valid execution.

If the Shubert Building Corporation had neither such title nor such power upon which to base the right to execute such mortgage, or if such power existed and was never exercised, we take it that it follows as a necessary conclusion that the mortgage was void and that no cause of action ever existed thereon in favor of The Cooper Investment Company."

The argument in support of this contention in brief, as stated by counsel, is:

"The point, therefore is, that The Shubert Building Corporation had no title or estate, either legal or equitable in the property described in the pretended mortgage. They were assigned to the trustee for the purposes stated in the trust agreement, and those purposes were not to secure anything owing to The Shubert Building Corporation, for no one was obligated in any manner to it, but to secure the so-called bonds in the manner specified, by raising the funds for the payment of their principal and six per cent per annum either through the sinking fund to be set aside during the term of the lease, or the sale of the properties and the termination of the enterprise. The only right, therefore, of The Shubert Building Corporation under the trust agreement was a simple contract right to receive a part of the surplus profits from the building in the event they should be made, and its remedy for the enforcement of that right was not in rem against the premises (for it neither had nor reserved any lien for that purpose), but against the trustee in equity for the proper discharge of its duties under the trust agreement."

There were just four parties that had any sort of interest in the leased premises and in the leasehold, and together they had all the interest in the property of whatsoever kind or character. These were The Cooper Investment Company, lessor, The Shubert Building Corporation, lessee, The German American Trust Company, trustee, and the so-called Profit Sharing Bondholders. These all agreed to and participated in the securing of the loan for the purposes intended, and the execution and delivery of the mortgage in question.

There is no suggestion of deception or fraud, nor that such action was not necessary or even vital to the enterprise, indeed, the bondholders had made the whole of the investment, and a forfeiture of the lease which was clearly imminent, would necessarily wipe out their investment in its entirety.

Under the circumstances of the case every bondholder was as fairly bound as if he had personally signed his written consent. The mortgage provision was provided in the lease, and included in the original and supplemental trust agreements, and was therefore binding upon the lessor, the lessee and trustee.

It was inserted in the so-called bonds and therefore became a specific obligation contained in the bondholders' contract, so that when all interests, expressly agreed to the execution of the mortgage which covered all their joint interests whatever they were, they and neither of them will be permitted to question the validity of the contract, which they directed to be made, on the ground that one of the parties may have but a conditional interest, or no interest at all.

Even if we were to concede that the bondholders had a superior lien on the leasehold premises, prior to the execution of the mortgage, they expressly waived that right by their voluntary consent to its execution and delivery, in the manner and form theretofore provided in their agreement with all the parties concerned. This voluntary agreement to the execution of the mortgage lien, by all parties in interest, necessarily superseded in that respect, all prior agreements, if any, in conflict therewith. The legal conclusion of the trial court based upon the facts presented, admits of no question. It was said:

"Here is what was accomplished, viz.: On the date of the execution of the indenture of lease, The Shubert Building Corporation became the holder of the legal title to the leasehold interest thereby created. It continued to be such legal holder until it executed and delivered the assignment of the leasehold interest to the German American Trust Company, and joined with that Company and the Cooper Investment Company in the execution of the trust agreement. Thereupon the Shubert Building Corporation ceased to be, and the German American Trust Company became the holder of the legal title, in trust for the Shubert Building Corporation, the bond holders, the Cooper Investment Company and itself.

The trust agreement not only authorized but it required the German American Trust Company to reassign the legal title to a mortgagee when requested so to do by the Shubert Building Corporation and two-thirds in amount of the bondholders, when it received the consideration for such mortgage. The mortgage was made by the Shubert Building Corporation to The Cooper Investment Company, the Shubert Building Corporation, and two-thirds of the amount of the bondholders requested the assignment of the leasehold interest to the Cooper Investment Company, and such assignment was made. The effect of the transaction was to mortgage the beneficial interest of the Shubert Building Corporation and the bondholders, whether it transferred to the Cooper Investment Company the legal title, or not."

This proposition of law neither requires argument nor the citation of authorities. Besides, the claim and contentions of plaintiffs in error find no support in equity or good conscience. It is patent that by reason of the sums of money secured by reason of the mortgage, the leasing company were enabled to complete at least the theater part of the building, and under the receivership in this case, and at comparatively small additional cost, the six-story part of the building has been entirely completed, and the forfeiture of the lease thus apparently avoided; this to the first and paramount benefit of the plaintiffs in error, and those similarly situated.

The judgment is affirmed.

Hill, C. J. and Garrigues, J., concur.